**In re SR REAL ESTATE HOLDINGS, LLC, Debtor.**

No. 13–09784–CL11.

United States Bankruptcy Court, S.D. California.

Signed Feb. 16, 2014.

Victor A. Vilaplana, Matthew J. Riopelle, Foley & Lardner, LLP, San Diego, CA, for Debtor.

## MEMORANDUM DECISION AND ORDER DISMISSING CASE

CHRISTOPHER B. LATHAM, Bankruptcy Judge.

For the following reasons, the court finds that Debtor's case was filed in bad faith and so **dismisses** it.

### Background

The material facts in this case are not in dispute. In June 2000, Blackhawk Financial Corporation ("Blackhawk") lent Sargent Ranch, LLC ("Sargent") $15 million at a 15% non-default interest rate. Adams Decl. ¶ 14, ECF No. 5; Debtor's Req. for Judicial Notice, Ex. 3, ECF No. 86–4. Sargent used these funds to purchase 6,400 acres of undeveloped real property near Gilroy, California (the "Property"). Adams Decl. ¶ 14. It planned to develop the Property for a variety of residential, industrial and commercial uses. Adams Decl. ¶ 12. And Sargent encumbered the Property with a first deed of trust to secure the loan. Adams Decl. ¶ 14. Later, in November 2000, Blackhawk increased the loan's principal amount to $25 million. Adams Decl. ¶ 14. Blackhawk also issued a second loan to Sargent for another $15 million, this time apparently at a 31% interest rate. Adams Decl. ¶ 15. A second deed of trust on the Property secured this second loan. Adams Decl. ¶ 15. Blackhawk then fractionalized[1] both loans and sold individual interests in them to various investors (the "First Lienholders" and "Second Lienholders," respectively). ¶¶ 14–15.

In October 2003, Blackhawk loaned Sargent an additional $3 million. Adams Decl. ¶ 16. A third deed of trust encumbered the Property and secured the Third Loan. Adams Decl. ¶ 16. And Blackhawk again fractionalized and sold the loan to individual investors (the "Third Lienholders"). Adams Decl. ¶ 16. Many of the individual interest holders were neighbors, friends and colleagues who lived in northern California. Adams Decl. ¶ 17. Consequently, the holders did not enforce the note for many years. Adams Decl. ¶ 17. But the Property remained undeveloped, and in late 2009 the First Lienholders directed the Third Lienholders to foreclose on the Property. Adams Decl. ¶¶ 18–19. On January 4, 2010, before the Third Lienholders could conduct a foreclosure sale, Sargent filed a voluntary Chapter 11 petition in Case No. 10–00046–PB 11 (the "First Case").

### The First Bankruptcy

The court found Sargent to be a single asset real estate ("SARE") debtor under

---

**1.** Mr. Adams's declaration states that Blackhawk "factionalized" the loans. Although this description is undoubtedly apt, the court finds it likely that Mr. Adams meant Blackhawk "fractionalized" the loans.

11 U.S.C. § 101(51B), subject to the hastened program described in 11 U.S.C. § 362(d)(3). First Case, ECF No. 118. To aid in its reorganization, Sargent employed The Watley Group, LLC ("Watley") as its exclusive investment banker. Watley provided Sargent, *inter alia*, a new CEO and several Managing Directors. First Case, ECF No. 104. But after nearly a year as debtor-in-possession, Sargent had not obtained approval of its disclosure statement, let alone confirmed a plan. And on December 28, 2010 the court directed the United States Trustee to appoint a Chapter 11 Trustee in the case. First Case, ECF No. 223. In describing the case, the Chapter 11 Trustee stated,

[D]ue to the lack of management mechanisms for the loans[ ], there is a deadlock of control among various interest holders in the first, second, and third trust deeds—some of whom own significant interests in each of the levels of debt—resulting in disagreement and distrust over the decisions with regard to the loans, and allegations of conflicts of interest. In short, there is no single party with decision-making authority that could authorize the employment of non-bankruptcy remedies for the benefit of the beneficiaries of the deeds of trust.

First Case, ECF No. 257.

On May 17, 2011, the court gave notice of its intent to convert the case to Chapter 7. First Case, ECF Nos. 324 & 325. On June 20, it held a hearing. First Case, ECF No. 336. And on July 22, it converted the case. First Case, ECF No. 338. In its conversion order, the court stated that "[t]he case has been through Mr. Pierce as manager, then the Watley Group, and then a Chapter 11 trustee. There does not appear to be a solution in the bankruptcy arena for this property and these parties." First Case, ECF No. 338. The United States Trustee then appointed a Chapter 7 Trustee, who promptly abandoned the Property. First Case, ECF Nos. 338 & 345.

## The Instant Bankruptcy

In early December 2011, the Third Lienholders conducted their foreclosure sale and successfully took title to the Property. Adams Decl. ¶ 30. Shortly thereafter, they created SR Real Estate Holdings, LLC ("Debtor"). Adams Second Decl. ¶ 26, ECF No. 84–1. And, eventually, they transferred the Property to Debtor. Adams Second Decl. ¶ 27. On August 14, 2012, the notes' servicer—Sargent Ranch Servicing Corporation—recorded "Majority Action Affidavit # 1" against the Property. Adams Second Decl. ¶ 31; Debtor's Req. for Judicial Notice, Ex. 1 at ECF No. 86–1.

The affidavit directed the servicer to pursue a global settlement to the various lienholders' disputes. Adams Second Decl. ¶ 32. It provided the Property's transfer to the First Lienholders, and a payment waterfall from the Property's proceeds. Adams Second Decl. ¶ 32. But a majority of the First Lienholders then emerged in support of foreclosure on the first trust deed. Adams Decl. ¶ 32. They scheduled a foreclosure sale for August 21, 2013. Adams Decl. ¶ 32. And on August 20, Debtor filed a voluntary Chapter 11 petition in the above-captioned case. Debtor's Petition, ECF No. 1.

Debtor's manager—Mr. Norman I. Adams—provided a declaration to support its petition. This declaration stated, "Debtor intends to promptly propose and seek confirmation of a viable plan of reorganization. . . . [It] intends to proceed on the schedule required of single asset real estate debtors if not even faster." Adams Decl. ¶ 34. Debtor's schedules valued the Property at $15 million. Debtor's Schedule A, ECF No. 25. But no payments had been made to the First and Second Lien-

holders for approximately thirteen years. As such, secured claims against the estate totaled an astounding $548 million: $142 million for the First Lienholders, and $406 million for the Second Lienholders. Debtor's Schedule D. Debtor scheduled both unsecured claims and personal property at approximately the same amount: $16,500. Debtor's Schedules B & F.

On October 7, creditors DACA 2010L, L.P. and Sargent Ranch Management Company, LLC (collectively, "DACA") moved to dismiss Debtor's case as a bad faith filing. ECF No. 57. The motion alternatively sought: (1) an order finding Debtor to be a SARE debtor; and (2) relief from the automatic stay. Creditors First Priority Lenders ("FPL") joined DACA's motion to dismiss. ECF No. 93. And Debtor brought opposition. ECF No. 84. This opposition explicitly affirmed that Debtor "does not contest that it is a SARE and consents to the Court making such a finding...." ECF No. 84. It also twice stated that Debtor would file its plan shortly, and within the SARE deadlines. ECF No. 84. No other parties came forth to oppose the motion. And DACA and FPL replied. ECF Nos. 100 & 101.

On November 4, the court held a hearing. ECF No. 106. The hearing's minute order indicated that the court took the matter under submission, but that DACA's counsel—William M. Rathbone, Esq.—was to prepare and lodge an order designating this case a SARE case. ECF No. 106. Three days later, Mr. Rathbone submitted his proposed order (the "SARE Order"). Although he did not lodge it, Debtor's counsel approved it as to form.

Then, on January 9, 2014, the court transferred this case from Judge Peter W. Bowie to Judge Christopher B. Latham. ECF No. 128. The next day, having reviewed the record, Judge Latham signed Mr. Rathbone's proposed order. ECF No.

135. The court entered the order on January 13. ECF No. 135. And on January 14, Debtor filed an emergency motion to vacate or stay the SARE Order. ECF No. 136. Despite Debtor's prior statements about its intent to promptly prepare a plan, it asserted that—because the court has potentially case dispositive motions under submission—the funds Debtor expends preparing a confirmable plan may go to waste. ECF No. 136. It therefore argued that entering the SARE Order caused it extreme prejudice. ECF No. 136. After examining the language and intent of § 362(d)(3), however, the court disagreed with Debtor and denied the emergency motion. ECF No. 145.

The court then held a status conference on this case, and Judge Latham heard renewed oral argument on February 12. ECF No. 148. Before the hearing, the court issued a tentative ruling that granted DACA's motion to dismiss. ECF No. 160. At the hearing's close, the court affirmed and adopted its tentative ruling. But it indicated that it would enter a separate order dismissing Debtor's case. The court accordingly **grants** DACA's motion and **dismisses** the case.

### Discussion

██ Section 1112(b) allows the court broad discretion to convert or dismiss a case for cause. And cause exists where a debtor lacks good faith in filing its case. *Matter of Little Creek Development Co.,* 779 F.2d 1068, 1072 (5th Cir.1986). "The existence of good faith depends on an amalgam of factors and not upon a specific fact. *Matter of Little Creek Development Co.,* 779 F.2d at 1072. The bankruptcy court should examine the debtor's financial status, motives, and the local economic environment. *Id.*" *In re Arnold,* 806 F.2d 937, 939 (9th Cir.1986).

If it is obvious that a debtor is attempting unreasonably to deter and harass

creditors in their bona fide efforts to realize upon their securities, good faith does not exist. But if it is apparent that the purpose is not to delay or defeat creditors but rather to put an end to long delays, administration expenses . . . to mortgage foreclosures, and to invoke the operation of the [bankruptcy law] in the spirit indicated by Congress in legislation, namely, to attempt to effect a speedy efficient reorganization, on a feasible basis . . . good faith cannot be denied.

*Id.* (quoting *In re Thirtieth Place, Inc.,* 30 B.R. 503, 505 (9th Cir. BAP 1983)).

■■■ In addition, Findings of lack of good faith in proceedings based on [§ 1112(b) ] have been predicated on certain recurring but non-exclusive patterns, and they are based on a conglomerate of factors rather than on any single datum. Several, but not all, of the following conditions usually exist. The debtor has one asset, such as a tract of undeveloped or developed real property. The secured creditors' liens encumber this tract. There are generally no employees except for the principals, little or no cash flow, and no available sources of income to sustain a plan of reorganization or to make adequate protection payments. . . . Typically, there are only a few, if any, unsecured creditors whose claims are relatively small. The property has usually been posted for foreclosure because of arrearages on the debt and the debtor has been unsuccessful in defending actions against the foreclosure in state court. . . . The "new debtor syndrome," in which a one-asset entity has been created or revitalized on the eve of foreclosure to isolate the insolvent property and its creditors, exemplifies, although it does not uniquely categorize, bad faith cases.

*Matter of Little Creek Development Co.,* 779 F.2d at 1072–73.

■■■ Importantly, the court may find indicia of bad faith where "[t]he debtor is attempting to use the provisions of Chapter 11 to create and organize a new business, not to reorganize or rehabilitate an existing enterprise, or to preserve going concern values of a viable or existing business." *In re ACI Sunbow, LLC,* 206 B.R. 213, 222 (Bankr.S.D.Cal.1997). Indeed,

Chapter 11 of the Bankruptcy Code has one purpose; the rehabilitation or reorganization of entities entitled by statute to its relief. . . . A corporation that is created for the purpose of filing a bankruptcy is an imposition on the state that charters the corporation and on the Chapter 11 court that serves to rehabilitate and reorganize the corporate debtor. Thus, [a] factual issue to be determined is whether the debtor was created for the predominant purpose of filing in bankruptcy.

*Id.* at 221 (quoting *In re Thirtieth Place, Inc.,* 30 B.R. at 505).

In *In re ACI Sunbow, LLC,* two liens encumbered 707 acres of undeveloped real property. *Id.* at 215. The junior of the two lienholders decided to sell its note and second trust deed. *Id.* Several individuals formed ACI Sunbow, LLC ("Sunbow") to bid on this note. *Id.* And Sunbow successfully purchased it for approximately 1% of its face value. *Id.* Meanwhile, the note on the first trust deed matured unpaid, and the first lienholder recorded a notice of default and election to sell the property. *Id.* at 216. Before the foreclosure sale could occur, Sunbow filed a voluntary Chapter 11 petition. *Id.*

The court conducted an extensive analysis of the "lack of good faith" standard

supporting cause for stay relief or dismissal. It found that,

There was no business or going concern which [Sunbow] took over or seeks to preserve, just a dormant real estate development project heavily in debt and default. [Sunbow] seeks to use the provisions of Chapter 11 to create a new business for itself, and to embark on a new speculative real estate venture, while denying [the first lienholder] its right after ten years to look to its collateral to satisfy the debt owed to it.... Further, the Court finds and concludes that under the circumstances of this case, the debtor's filing was a bad faith filing regardless of whether the debtor might be able to reorganize [through a Chapter 11 plan].... an issue on which the Court expresses no opinion at this juncture. The facts of this case meet most of the factors listed in *Little Creek*.... But even with all [these] factors which favor a finding of bad faith, the subjective bad faith of the debtor in attempting to use the bankruptcy process not to reorganize or rehabilitate a struggling entity, but rather to organize a speculative real estate venture at the risk of the secured creditor warrants [finding cause for stay relief or dismissal].

*Id.* at 225.

 The facts at bar are complex and present a close case for determining Debtor's bad faith. Like *ACI Sunbow,* this case meets most of the *Little Creek* factors. Debtor essentially has one asset: the Property. There is no dispute that the Property is over-encumbered and generates little cash flow. There is no indication that Debtor has any employees other than its principals. It has few unsecured creditors. The amount of its facially secured debt eclipses the sum total of its unsecured debt. Debtor filed its bankruptcy on the eve of the First Lienholders' foreclosure sale. And, although Debtor argues that it has a willing and able investor to sustain a plan of reorganization or make adequate protection payments, Debtor has demonstrated reluctance in expending any such funds to either propose a plan or make payments to lienholders. Indeed, at the court's February 12 hearing, movant's counsel represented that Debtor failed to pay post-petition taxes, instead leaving it to lienholders to do so.

Moreover, like Sunbow, Debtor has no business or going concern to preserve. The Property is mostly undeveloped. Any feasible plan of reorganization must necessarily create a new business that develops the Property. And this, despite Debtor's arguments, is at the expense of the first lienholders; lienholders whose corresponding notes—like the notes in *ACI Sunbow*—are in default. Debtor's bankruptcy has kept lienholders, who are actively trying to foreclose, from using their collateral to satisfy their debt. Even if Debtor could present a successful plan that provides surviving lienholders everything they're entitled to in bankruptcy, it will still deprive them of their right to sell the Property and credit bid to obtain its possession. If Debtor's plan fails, the First Lienholders will have suffered considerable delay. And to what end? So that a third party can—through the rights of the former Third Lienholders—engage in a speculative real estate adventure?

Debtor argues that *ACI Sunbow* and *Little Creek* do not support a bad faith finding because Debtor: (1) has a commitment from an investor to provide sufficient cash to fund a plan; (2) is comprised of the former Third Lienholders; (3) has unsecured creditors in excess of $500 million

due to its vast undersecured debt; (4) intends to use its bankruptcy to consummate a deal that benefits the undersecured lienholders and closely resembles the agreement they had nearly reached prepetition; and (5) was not formed on the eve of bankruptcy. Again, the court recognizes that the facts here do not precisely mirror those in the relevant and persuasive authorities. But under the totality of the circumstances, these factual distinctions do not defeat a finding of bad faith.

That Debtor has a potential investor to fund a plan does not mitigate the fact that there is no going concern value to be captured. The Property is undeveloped; it has no present, special configuration that provides something beyond its liquidation value. Rather, this is one in a history of many attempts to develop the Property for profitable use. That the former Third Lienholders are at the helm makes no difference. Indeed, the order converting the first bankruptcy case noted that three different managers could not find a solution for this Property and these parties in the bankruptcy arena. Thus, without speaking to the merits of Debtor's plan, to characterize any eventual reorganization as something other than a speculative real estate venture would be wholly unpersuasive.

That lienholders are vastly undersecured, and that Debtor intends to replicate a prepetition deal which benefits these undersecured creditors, is also unpersuasive. First, the court notes that none of these undersecured creditors stepped forward to object to the motion to dismiss. Further, the *de facto* formation of a previously failed bargain serves no legitimate bankruptcy purpose. Although, in certain circumstances, a debtor may structure a plan in a way that forces the other side to accept terms it rejected prepetition, this is not the objective of Chapter 11. The court is mindful of the fractured, combative history underlying the trust deeds. And it understands the allegations of sharp tactics on the part of certain lienholders. Yet the fractionalized interests presumably agreed to a voting structure that allowed such tactics.[2] And, moreover, two wrongs do not make a right; a creditor's sharp tactics outside of bankruptcy does not undo a debtor's bad faith filing.

Finally, that Debtor was not formed on the eve of bankruptcy does speak against a finding of "new debtor syndrome." The court is not here relying on "new debtor syndrome" to support its finding of bad faith. But it notes that, although the former Third Lienholders formed Debtor approximately twenty months before the petition date, the structure and amount of the liens—and their underlying interests—made it eminently foreseeable that Debtor would have to file bankruptcy. Debtor's principals knew that the fractionalized interests in the trust deeds were locked in a divisive struggle to determine whether to foreclose on the Property. Its principals thus knew that foreclosure was a possibility. And they knew that the only way to stall such foreclosure would be through a bankruptcy petition. Although the Third Lienholders may not have formed Debtor for the sole purpose of filing this bankruptcy, they surely formed it with the probability of such bankruptcy in mind.

2. If the lienholders wished to preserve some sort of communal intent to act only for the benefit of the whole group—rather than the benefit of each trust deed—they should have appointed a trustee with fiduciary duties to execute this intent. Instead, they have apparently allowed majority rule to govern their trust deeds.

## Conclusion

At the hearing, Debtor argued that this ruling is a dangerous expansion of the "bad faith" standard for dismissal under *Little Creek* and *In re Arnold*. But the court disagrees. It again emphasizes the peculiar facts surrounding this case: (1) a SARE debtor with an asset encumbered at least six times over; (2) nearly $550 million in secured debt from two deeds of trust accruing interest at 15% and 31% over the past thirteen years; (3) fractionalized and interrelated interests in those trust deeds locked in a power struggle over how to proceed with the Property; and (4) a compelling history of multiple bankruptcy filings with multiple managers' unsuccessful attempts to bring the Property to profitable use. In the totality of the circumstances, these facts indicate that Debtor brought this power struggle into the bankruptcy arena to cause delay and hinder the First Lienholders in their bona fide efforts to realize upon their collateral. Debtor therefore filed its petition in bad faith. Like *ACI Sunbow*, the court makes this finding regardless of whether Debtor might be able to reorganize through a Chapter 11 plan—an issue on which the court expresses no opinion. It thus **grants** DACA's motion and **dismisses** Debtor's bankruptcy case under 11 U.S.C. § 1112(b).

IT IS SO ORDERED.